UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NIKKI STEWART,<br>2619 Douglass Road, SE<br>Apartment 102,<br>Washington, DC 20020<br><br>    Plaintiff,<br><br>    v.<br><br>EXCEL ACADEMY<br>PUBLIC CHARTER SCHOOL,<br>3845 S. Capitol Street, SW<br>Washington, DC 20032<br><br>LELA JOHNSON,<br>In her individual capacity<br>7502 LOCRIS DR APT 204<br>UPPER MARLBORO, MD 20772-4435<br><br>VITO GERMINARIO,<br>In his individual capacity<br>37963 JOHN MOSBY HWY<br>MIDDLEBURG, VA 20117-2907<br><br>DR. EDWIN POWELL,<br>In his individual capacity<br>1754 VERBENA ST NW<br>WASHINGTON, DC 20012-1049<br><br>DEBORAH LOCKHART,<br>In her individual capacity<br>1406 CARROLLSBURG PL SW<br>WASHINGTON, DC 20024-4102<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:15-cv-1120 |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE,
AND MONETARY RELIEF AND JURY DEMAND**

**INTRODUCTION**

1

1. This is an action against Defendants Excel Academy Public Charter School ("Excel," or "the School"), Lela Johnson ("Ms. Johnson"), Vito Germinario ("Mr. Germinario"), Dr. Edwin Powell ("Dr. Powell"), and Deborah Lockhart ("Ms. Lockhart") (collectively referred to as "Defendants") for declaratory and injunctive and monetary relief. This Complaint seeks to redress harm that Plaintiff Nikki Stewart ("Plaintiff" or "Ms. Stewart") suffered as a result of Defendants' wrongful discharge, discriminatory and retaliatory conduct, and defamation.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because some parties reside in different states and the amount in controversy exceeds $75,000.00.

3. Venue is proper under 28 U.S.C. § 1391(b)(2), as the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## PARTIES

4. Plaintiff Nikki Stewart is an adult resident of the District of Columbia, and was at times relevant to this Complaint an employee of Defendant Excel Academy Pubic Charter School.

5. Defendant Excel Academy Public Charter School is an education institution for young girls located in Washington, D.C. At times relevant to this Complaint, Excel was Ms. Stewart's employer.

6. Defendant Lela Johnson is an adult resident of Maryland, and was at times relevant to this Complaint Ms. Stewart's supervisor and an employee of Excel.

7. Defendant Vito Germinario is an adult resident of Virginia, and was at times relevant to this Complaint on the Board of Directors for Excel.

8. Defendant Dr. Edwin Powell is an adult resident of the District of Columbia, and was at times relevant to this Complaint on the Board of Directors for Excel.

9. Upon information and belief, Defendant Deborah Lockhart is an adult resident of the District of Columbia, and was at times relevant to this Complaint on the Board of Directors for Excel.

## FACTUAL ALLEGATIONS

10. Ms. Stewart began her employment with Defendant Excel Academy Public Charter School in July 2008 as a founding team member and lead pre-school teacher.

11. Ms. Stewart earned several promotions based on her exceptional performance at Excel, eventually serving as Academic Dean and, later, Chief Academic Officer.

12. However, despite being the most qualified candidate, Excel never allowed Ms. Stewart to serve as Principal because of her physical appearance.

13. Ms. Stewart also filed several internal and external complaints about the waste, fraud, and abuse occurring at Excel.

14. Excel ultimately terminated Ms. Stewart in 2014 for reporting Defendants' unlawful conduct.

<u>Concerns Regarding Defendants' Performance and Illegal Conduct</u>

15. In December 2009, Ms. Stewart witnessed then Dean of Students, Defendant Lela Johnson, become inebriated at a holiday party and lock herself in the bathroom with an Excel security staff member who was also the father of two Excel students.

16. Ms. Stewart reported the holiday party incident to Excel's Principal at the time.

17. Ms. Stewart frequently reported concerns about Ms. Johnson's conduct and promotion to Principal to Chief Executive Officer, Defendant Kaye Savage.

18. Rather than reprimand Ms. Johnson for her inappropriate behavior, Excel promoted Ms. Johnson to Principal at the end of the 2009-2010 school year.

19. Ms. Stewart was not the only individual to report Ms. Johnson's conduct.

20. During the 2010-2011 school year, Head of Operations Joyanna Smith ("Ms. Smith") filed a formal complaint against Excel leadership including her concerns about Ms. Johnson's conduct and promotion to Principal.

21. Rather than reprimand or counsel Ms. Johnson, Excel terminated Ms. Smith from her position at the end of the school year.

22. Upon information and belief, Ms. Johnson lost the school's standardized test results for the 2009-2010 school year.

23. Upon information and belief, Ms. Johnson also failed to submit completed standardized test booklets for the 2010-2011 school year. Rather, they were haphazardly packed in an office move, fell out of a moving truck on the way to the new office, and were strewn across a major street.

24. The District of Columbia found that Excel was not in legal compliance with Special Education requirements for the 2010-2011 school year. A Childhood Report Card from the Public Charter School Board ("PCSB") also reflected that Excel met zero of six targets.

25. Despite Ms. Johnson's deficient performance during the 2010-2011 school year, she remained in the Principal position for a second year.

26. Ms. Stewart was promoted to Academic Dean for the 2010-2011 academic year. Recognizing that Ms. Johnson was derelict in her duties, Ms. Savage began to delegate Ms. Johnson's duties to Ms. Stewart.

27. In the 2011-2012 school year, Ms. Stewart learned that Excel Board of Directors Chair Defendant Vito Germinario would not permit Ms. Johnson to be removed as Principal.

28. Upon information and belief, Mr. Germinario hired Ms. Johnson's husband (after an extended period of unemployment as a personal favor to Ms. Johnson.

29. At the close of the school year, Ms. Savage promoted Ms. Stewart to Chief Academic Officer.

30. Shortly thereafter, Excel announced Ms. Johnson would serve simultaneously as Executive Principal and Chief of School Culture and Student Life for the 2012-2013 school year.

31. During the 2012-2013 school year, Excel spent exorbitant resources to improve Ms. Johnson's performance, even hiring an executive coach to coach Ms. Johnson.

32. During that school year, Ms. Stewart learned that Ms. Johnson lived in Maryland, but was sending her daughter to Excel, a charter school devoted to serving residents of the District of Columbia.

33. Ms. Stewart reported to Ms. Savage her concerns that Ms. Johnson, the School's Executive Principal, was committing residency fraud.

34. Upon information and belief, Ms. Savage brought Ms. Stewart's concerns about Ms. Johnson's residency fraud to Mr. Germinario.

35. Upon information and belief, neither Ms. Savage nor Mr. Germinario pursued the issue of Ms. Johnson's residency at that time.

36. In September 2013, Ms. Stewart officially complained to Ms. Savage about Ms. Johnson's performance and residency fraud.

37. After filing her complaint, Ms. Stewart suffered from such severe anxiety that she went to the emergency room with chest pains.

38. Excel ignored Ms. Stewart's complaints, and Ms. Stewart never received a formal response from management.

39. Upon information and belief, Ms. Stewart's formal complaint was distributed to the Excel Board of Directors. Ms. Stewart was no longer invited to Board meetings as she had been before she filed her complaint.

40. In the 2013-2014 school year, Excel experienced budget issues as a result of low enrollment.

41. In 2013/2014 Ms. Johnson was in charge of attendance and enrollment. However, Mr. Germinario blamed Ms. Stewart for the budget issue, stating that she was spending excessively on curriculum.

42. In 2012/2013, in order to create the appearance of improved student attendance, Ms. Johnson unilaterally changed Excel's absence policy so that parents could excuse their children's absences. Ms. Johnson did this without filing the change with the PCSB, as is required.

43. Ms. Johnson directed teachers to call parents to excuse students' absences for all dates within the entire school year.

44. As a result of the phone calls to parents, Excel's average daily attendance appeared to reach 95%.

45. Ms. Savage told Ms. Stewart that that Mr. Germinario was having offline conversations and social outings with banks that were bidding against each other to finance the purchase of Excel's building.

46. Ms. Savage told Ms. Stewart that Mr. Germinario planned to run contracts through the building once it was purchased.

47. Upon information and belief, Mr. Germinario required Ms. Johnson to maintain high-level positions with Excel in order to ensure his personal agenda would be carried out.

<u>Defendants Fail to Promote Ms. Stewart to Principal</u>

48. In June 2014, Excel's Principal resigned.

6

49. On June 9, 2014, Ms. Savage and Ms. Stewart signed an offer letter appointing Ms. Stewart the Principal position for three years.

50. However, Ms. Savage informed Ms. Stewart "the Board of Directors was out to get her (Ms. Stewart)."

51. Ms. Savage told Ms. Stewart that the Board did not want Ms. Stewart to serve in any leadership capacity due to her physical appearance and that the Board preferred Ms. Johnson's physical appearance.

52. Excel management officials had made frequent comments about Ms. Johnson's appearance in the past.

53. When decisions were being made as to which positions Ms. Johnson and Ms. Stewart should hold, Excel's former executive coach compared Ms. Stewart and Ms. Johnson to horses. She said that "there are show horses and there are workhorses." She said Ms. Stewart was a "workhorse" and Ms. Johnson was a "show horse" and more deserving of a more visible position, like Principal and Head of School.

54. Upon information and belief, Mr. Germinario also preferred to have Ms. Johnson stay in visible leadership positions like Principal and Head of School because he liked the way she looked.

55. On June 12, 2014, Ms. Savage told Ms. Stewart that Excel was missing enrollment paperwork for hundreds of students and that there were four hundred children who had not reenrolled. Ms. Johnson was primarily responsible for enrollment, along with Excel's Registrar.

56. Shortly thereafter, Mr. Germinario initiated a hiring freeze without the approval of the Board of Directors.

57. Upon information and belief, Mr. Germinario put forward a plan at a Board of Directors meeting to remove Ms. Savage and place Ms. Johnson as Head of the School.

58. Despite the offer letter giving Ms. Stewart the Principal position, the Board of Directors asked Ms. Stewart to come up with a different position for herself in the Advancement Office.

59. Ms. Savage stated that board member Dr. Edwin Powell asked for this position description. Dr. Powell had been named a one-person "academic committee" at the same June BOD meeting in which Mr. Germinario proposed the promotion of Lela Johnson to Head of School. Dr. Edwin Powell conducted this 1-week "investigation of the academic program" which ultimately served as the bogus rationale for Ms. Stewart's termination. This "investigation" was designed to terrorize and destabilize the academic program and the team of principals and instructional coaches Ms. Stewart led.

60. On June 27, 2014, Excel formally announced Ms. Johnson as the Head of School, replacing Ms. Savage.

61. Ms. Savage told Ms. Stewart that Ms. Stewart was to be removed from the academics side of Excel, which, given Ms. Stewart's prior positions and history with Excel, was a significant removal of responsibilities and was particularly punitive.

62. When discussing Ms. Stewart's new duties, Ms. Savage said: "When you dig a grave, you better build a second one for yourself." She also remarked: "When you sling mud, be ready to get dirty."

<u>Excel Terminates Ms. Stewart for Reporting Waste, Fraud, and Abuse</u>

63. On July 1, 2014, Ms. Stewart reported Defendants' illegal activity to the Office for the State Superintendent of Education ("OSSE").

8

64. She told the OSSE that Ms. Johnson and members of the Board of Directors had been committing residency fraud. She also disclosed Ms. Johnson's inability to properly administrate Excel.

65. Ms. Stewart told the OSSE that she had learned that Mr. Germinario was forcing Ms. Savage to sign contracts that were duplicative, unnecessary, and a waste of resources. Ms. Stewart reported, for instance, that Mr. Germinario was forcing Ms. Savage to sign a security contract when Excel already had a security contract.

66. Ms. Stewart also reported that Mr. Germinario had used his own glass company to complete the glasswork on Excel's building, despite the fact that his company did not put in the lowest bid for the contract and the materials did not conform to industry standards.

67. Ms. Stewart then called the PCSB and made the same report.

68. Immediately after filing the reports, Ms. Stewart felt unsafe in the building and suffered from such severe anxiety that she visited the Emergency Room.

69. In July 2014, Ms. Stewart notified Excel through counsel that she was considering potential legal action against the School for retaliation.

70. On August 14, 2014, just over a month after Ms. Stewart reported incidents of criminal waste and fraud and approximately one month after Ms. Stewart notified Excel that she was considering taking legal action, Excel terminated Ms. Stewart from her employment.

Excel and Ms. Lockhart Defame Ms. Stewart

71. On November 4, 2014, the Washington Post published an article about the waste, fraud, and abuse that Ms. Stewart had reported to the OSSE and the PCSB.

72. The Washington Post article stated that Ms. Stewart was pursuing a retaliation claim against Excel because Excel terminated her five weeks after reporting to the OSSE and PCSB about the residency fraud.

73. The Washington Post article states that, while Excel terminated Ms. Stewart after reporting the illegal conduct, Excel placed Ms. Johnson in a new position as Executive Principal pending investigation into her residency fraud.

74. The Washington Post article also quoted the Excel Chair of the Board of Directors Defendant Deborah Lockhart in saying that the Board decided to replace the top leadership of the school due to low teacher and staff retention rates and low morale that was "manifested by poor management of the instructional and administrative staff." Ms. Lockhart was referring to Ms. Stewart, who supervised the instructional and administrative staff.

75. Ms. Lockhart's public statement that teacher and staff retention and morale were low were false, as Ms. Stewart facilitated the highest rates of teacher and staff enrollment in the history of Excel Academy, including 86% teacher retention for the year in question. There was no indication of low morale among staff until the launch of an "academic investigation" by the Board of Directors in June 2014, conducted solely by Dr. Edwin Powell.

### STATEMENT OF CLAIMS

### COUNT I: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

76. Ms. Stewart incorporates all the allegations contained in paragraphs 1-75 as if stated herein.

77. The District of Columbia recognizes an exception to the at-will employment doctrine whereby an employer may not terminate an employee in retaliation for reporting misconduct that violates federal or state law or in retaliation for engaging in conduct that is protected by a clear public policy as set forth in a statute or regulation.

78. Defendants discharged Ms. Stewart from her employment in August 2014, just over a month after Ms. Stewart reported incidents of criminal waste, fraud, and abuse to the Office of the State Superintendent and the Public Charter School Board and approximately one month after Ms. Stewart notified Excel that she was considering taking legal action.

79. Defendants terminated Ms. Stewart because she reported Defendants' unlawful conduct, including residency fraud in violation of D.C. Code § 38-1802.06, and because she threatened to take legal action against Defendants.

80. By terminating Ms. Stewart for reporting unlawful conduct and threatening to take legal action against Defendants, Defendants acted contrary to public policies that the District of Columbia seeks to vindicate.

81. Defendants' conduct was intentional, malicious, and recklessly indifferent to Ms. Stewart's legal rights.

82. As a direct and proximate result of Defendants' unlawful conduct, Ms. Stewart has and will continue to suffer damages including, but not limited to, lost earnings past and future, lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

### COUNT II: DISCRIMINATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT

83. Ms. Stewart incorporates all the allegations contained in paragraphs 1-82 as if stated herein.

84. The D.C. Human Rights Act makes it unlawful for an employer to discriminate against an employee with respect to the terms, conditions, or privileges of employment on the basis of her personal appearance.  D.C. Code § 2-1401.11(a).

85. Throughout her employment with Defendants, Ms. Stewart was treated differently from similarly situated coworkers because of her physical appearance.

86. Ms. Stewart was fully qualified to work as the School's Principal and met all requirements including health and safety requirements.

87. Despite Ms. Stewart's qualifications for the job, Defendants failed to promote her to Principal and, instead, wrongfully discharged her from her employment.

88. Defendants failed to promote Ms. Stewart and wrongfully terminated her from her employment because of her physical appearance.

89. Defendants' conduct was intentional, malicious, and recklessly indifferent to Ms. Stewart's statutory rights.

90. As a direct and proximate result of Defendants' unlawful conduct, Ms. Stewart has and will continue to suffer damages including, but not limited to, lost earnings past and future, lost earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT III: DEFAMATION

91. Ms. Stewart incorporates all the allegations contained in paragraphs 1-90 as if stated herein.

92. Defendants Excel and Deborah Lockhart made false, misleading and defamatory statements about Ms. Stewart at a public meeting and in a Washington Post article in November 2014.

93. Excel and Ms. Lockhart caused there statement to be published to a third party, the Washington Post newspaper.

94. These statements were made with malice and were, at least, negligent.

95. These statements are actionable as a matter of law irrespective of special harm, but indeed did cause Ms. Stewart special harm.

96. As a direct and proximate result of Defendants' unlawful conduct, Ms. Stewart has and will continue to suffer damages including, but not limited to, lost earnings past and future, lost

earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## PRAYER FOR RELIEF

**NOW, WHEREFORE,** Ms. Stewart prays this Court to:

a. Enter judgment in her favor against Defendants for wrongful termination, discrimination, and defamation;

b. Award Ms. Stewart compensation of lost wages;

c. Award Ms. Stewart compensatory damages in an amount to be shown at trial, but in no event less than $100,000;

d. Award Ms. Stewart punitive damages in an amount to be shown at trial;

e. Award Ms. Stewart reimbursement of the attorneys' fees and costs she has expended in litigating this matter; and

f. Grant her such other and further relief as justice may require.

## JURY DEMAND

Ms. Stewart seeks trial by jury on all matters and issues that can be so tried.

Dated: July 14, 2015

Respectfully submitted,

_____
Ari M. Wilkenfeld (Bar No. 461063)
The Wilkenfeld Law Group
1726 Connecticut Avenue, NW
Suite 200
Washington, DC 20009
T: 202.765.2253
F: 202.600.2792
ari@wilkenfeldlaw.com

_____
Rosalind H. Herendeen (Bar No. 1021518)
The Wilkenfeld Law Group
1726 Connecticut Avenue, NW
Suite 200
Washington, DC 20009
T: 202.765.2253
F: 202.600.2792
rosalind@wilkenfeldlaw.com